Estate of Eliza M. Vrooman, Bess Vrooman Sheehan and Burt A. Vrooman, Former Executors and Residuary Legatees and Distributees of Said Estate v. Commissioner.
Estate of Eliza M. Vrooman v. Commissioner
Docket No. 7339.
United States Tax Court
1947 Tax Ct. Memo LEXIS 97; 6 T.C.M. (CCH) 1011; T.C.M. (RIA) 47246; August 28, 1947
*97 Decedent was concerned about the economic condition of her son and daughter, and as they had borne the expenses of certain litigation involving her interest in the estate of her half brother, prosecuting the litigation in her name, to a successful conclusion, she transferred $40,000 cash to each of them. Held, under all the facts and circumstances $ no part of the amounts transferred is includible in decedent's gross estate as transfers in contemplation of death. Sidney U. Hiken, Esq., 1 N. La Salle St., Chicago 2, Ill., for the petitioners. Jackson L. Boughner, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: Respondent determined a deficiency in estate tax in the sum of $19,422.45. By *98 an amended answer he increased the deficiency originally determined to $23,922.45. The issues are: (1) whether transfers by decedent of $80,000 to her son and daughter on April 14, 1939 were made in contemplation of death; (2) whether $10,000 deposited in the joint names of decedent and her son, Burt A. Vrooman, at the date of death is includible in decedent's gross estate. The parties filed a stipulation of facts which was supplemented by depositions, documentary evidence and oral testimony. $ Findings of Fact The petitioner is the estate of Eliza M. Vrooman, deceased, which is represented by Bess Vrooman Sheehan and Burt A. Vrooman, former executors and residuary legatees and distributees of the estate. Eliza M. Vrooman, hereinafter referred to as the decedent, died testate, a resident of Dowagiac, Michigan, on December 29, 1942, at the age of 90 years. The immediate cause of death was acute angina pectoris of onehalf hour's duration. On October 3, 1936 Charles N. Halsted, decedent's half brother, died intestate, leaving a large estate. His widow died on $ October 29, 1936, 26 days after her husband's death. Decedent's children were interested in sharing in Halsted's estate *99 and asked decedent to take legal steps to obtain a portion thereof as next of kin. Decedent stated that she was not interested in the estate for herself, that she did not need the property, but that she wanted her children to share in her half brother's estate as he had repeatedly promised they would share under the terms of his will. To aid her children in procuring their share of his estate, $ she agreed to sign her name to the necessary papers if her daughter and son-in-law would take full responsibility for the litigation and all expenses incident thereto. Decedent's son-in-law, who was a lawyer, advanced funds for the expenses of the protracted litigation which followed. During the course of the litigation and on January 19, 1938 the decedent executed two assignments, one to each of her children, identical except for the name of the assignee, which provided as follows: "KNOW ALL MEN BY THESE PRESENTS that I, $ ELIZA VROOMAN, of the City of Dowagiac, Cass County, Michigan, for and in consideration of the sum of One ($1.00) dollar and other good and valuable consideration, to me in hand paid, the receipt of which is hereby acknowledged, do hereby sell, transfer, convey and assign *100 unto BESS M. SHEEHAN, of the City of Gary, Indiana, an undivided one-third (1/3) share and/or interest in and to my share and/or interest of the Estate of Charles N. Halsted, late of the City of Lansing, State of Michigan; it being my intention to hereby sell, transfer, convey and assign an undivided one-third (1/3) interest in all property, lands, money, estate and proceeds that I may be entitled to receive as heir at law of the said Charles N. Halsted, deceased. "TO HAVE AND TO HOLD said premises, property and money, with all and singular the appurtenances, unto said $ BESS M. SHEEHAN, her heirs and assigns forever. "IN WITNESS WHEREOF, I have hereunto subscribed my name at Gary, Indiana, this 19 day of January, 1938. "(Signed) Eliza M. Vrooman "A. S. Hyman Witness "Nola Larson Witness" The assignments were prepared by decedent's son-in-law after a discussion of the litigation in connection with the Halsted estate. The assignments were primarily an understanding of the amount that each would participate in upon any recovery from the Halsted estate and protected the heirs of decedent's children in the event that either her son or daughter predeceased the determination *101 of the litigation. Decedent's son and daughter felt that inasmuch as the litigation had to be brought in her name that she should also share in whatever recovery was had. Prior to or on April 13, 1939 a decree was entered on a joint statement of facts in the Halsted litigation. On April 13, 1939 decedent received the sum of $173,908.61 from the estate of Charles N. Halsted. On April 13, 1939 the decedent was over 86 years of age. On April 14, 1939 the decedent transferred from said amount of $173,908.61 the sum of $40,000 to her son, Burt A. Vrooman, and the sum of $40,000 to her daughter, Bess Vrooman Sheehan. The balance was deposited in checking accounts and with building and loan associations. For the calendar year 1939 the decedent filed a gift tax return in which she stated that the motive for the transfers to her son and daughter was "love and affection." Prior to and at the time of the transfers aforementioned decedent's daughter suffered from bronchial asthma. Her club and public activities were also a strain on the daughter's health. She had been advised by her physician that a change of climate might improve the $ condition of her health, but she was unable to follow *102 the advice of her physician for financial reasons. The daughter and her husband lived in a small apartment in a congested neighborhood. Decedent wanted her daughter to have a home of her own and was concerned about the condition of her daughter's health. When the money was received from the Halsted estate decedent $ stated that the money should help to make things a little easier for her son and daughter. $&1013 Decedent's son was also in straitened financial circumstances. He lived in a small house on the outskirts of Winston-Salem, North Carolina, and had an average income of about $500 a year. His mother helped him financially, paid his expenses when he came to visit her and sent him money when his wife was injured. He mortgaged a piece of property that he owned and defaulted on the mortgage. Decedent acquired the mortgage and left it to her son when she died. Decedent was concerned about her son's financial condition and the circumstances under which he lived. She expected that things would be easier for him through the money received from the Halsted estate. Prior to the receipt of funds from the Halsted estate decedent had the income from two store buildings, a house, and *103 a cottage. She owned the home in which she lived free of encumbrance. She owned an automobile and kept a servant. While her income was not large she lived comfortably thereon. During his lifetime Charles Halsted had stated that he had provided for his servants in his will. When no will of Charles Halsted could be found the decedent, upon receipt of funds from his estate, made gifts of $500 to the cook, $500 to the maid, and $250 to the gardener in order to carry out the wishes of her half brother. Decedent's daughter used a portion of the funds transferred to her to build a home which was completed in 1940. She used a portion of the funds to take a trip to Florida for her health and later took a trip to Arizona for her health, both trips being made pursuant to the advice of her physician. Decedent's son used a portion of his $40,000 to buy some more land, build a garage and outbuildings, and to purchase a couple of houses and lots in Winston-Salem which provided him with a little income. At the time of the transfers decedent was being treated at her doctor's office for an irritation of the throat. Decedent was afflicted with a catarrhal complaint that was $ common to 75 per cent *104 of the population in the region where she lived. Her doctor's records show 20 office calls by decedent during the period November 10, 1938 through June 26, 1939. The November 10th notation states her condition to be "moderate irritation of throat. Given nose and throat treatment." The next eight notations state "similar condition and treatment." The remaining office calls during this period were for "throat treatments." From August 14, 1933 through the calendar year 1940 the medical records of decedent's physician show the continued existence of the catarrhal condition with treatment from time to time. Generally the treatments were more frequent during the winter months. In addition the doctor's records show a rheumatic condition accompanied by lameness in arms, $ legs and back prevalent during the winter months of 1936-1937. On January 4, 1937 decedent had three teeth extracted. Decedent's rheumatic condition responded to treatment, as she did not consult her doctor from March 20, 1937 until December 18, 1937. The doctor's notation on this visit reads: "Cold, still has some lameness. Appropriate cold treatment." During 1938 her $ condition was much better, her principal trouble, being *105 her catarrhal condition and three treatments for poor elimination. Late in 1939 and during 1940 decedent received cold vaccines and treatment for her catarrhal condition. During the period August 14, 1933 to December 28, 1940, the records of decedent's doctor show 163 calls of which 88 were house calls largely occurring during her illness in the winter of 1936-1937. Her blood pressure during this entire period was generally good for a woman of her age and there was no indication of any condition which would be fatal. During 1939 decedent's physical appearance was excellent. She gave the appearance of being 10 to 15 years younger than her age. She went regularly to the beauty parlor and visited her doctor's office unattended. She was fastidious in her dress and mentally alert. Her spirits were buoyant and she never discussed such topics as illhealth and death. She gave no indication that she was concerned about death. She was a charter member of her club and had been active in it for 52 years at the time of her death. She enjoyed conventions and often attended them with her daughter who had achieved some prominence in club activities and public affairs. She participated actively in *106 her bridge club and several other organizations to which she belonged. She visited her daughter in Gary, Indiana, two or three times a year coming and going alone on the train. She went to picture shows. She shopped each spring and fall in Gary or Chicago for clothes going around in high-heeled shoes all the time. She planned to remodel her 11-room home in which she lived alone except for domestic help. In 1940 she completely rearranged her shrubbery about her home in order to change the floral appearance of the entire yard. During 1940 she planned the remodeling of a lake cottage in which she had only a life estate. In 1940 she bought a new car because she wanted a nice looking car with everything in it including a radio, a cigarette lighter, two tail lights, and like accessories. The transfers that decedent made to her son and daughter on April 14, 1939 were not made in contemplation of death. Decedent's dominant motive in making the transfers was to aid her children. On the date of death of the decedent there was on deposit in the Gary Trust & Savings Bank, Gary, Indiana, the sum of $5,000 in the names of decedent and Burt Vrooman as joint tenants. A like amount was on deposit *107 in the Gary State Bank, now Gary National Bank, Gary, Indiana, in their names as joint tenants. The $10,000 on deposit in said joint accounts was part of the $40,000 transferred to Burt A. Vrooman on April 14, 1939. The omitted portions of the stipulated facts are incorporated herein by reference. Opinion The principal and virtually the only question to be decided, in view of the stipulated facts, is whether decedent's transfer of $80,000 on April 14, 1939 was made in contemplation of death. One can not read the record in this case without feeling the interest that decedent maintained in life and the things about her regardless of her age. Two doctors, a lawyer, her servant, her son and daughter, and others testified to her active and continued interest in life up to the last month or two before her death. Almost without exception these witnesses told of her mental alertness to the last. Her lawyer testified that she knew what she wanted in $ her several wills and directed him with respect thereto. Both doctors commented upon how remarkably well preserved she was for a woman of her age, and how well she responded to medical treatment for her rheumatic condition. Her medical records *108 and the doctor's testimony indicate that her blood pressure was very good for a woman of her age. She had no serious illness or condition which would indicate termination of life shortly before her death. Except for her advanced age this record is devoid of support for respondent's determination. We do not think that age alone is sufficient to throw these transfers into decedent's gross estate. The statute prescribes that transfers in contemplation of death are to be included in the gross estate. If it can not be said that the transfers were in contemplation of death then section 811 (c) of the Internal Revenue Code does not apply. If old age alone is to be the determining factor, as it must be in this case, then we have the words of the Supreme $ Court to support our holding. In United States v. Wells, 283 U.S.$ 102 [2 USTC [*] 715], the Supreme Court said, page 117: "* * * Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation *109 of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand'." The medical history of the decedent before, at the time of, and after the transfers, leave no doubt that her health was sound regardless of age. Her actions with respect to the litigation to share in the estate of her half brother are convincing that the transfers grew out of the successful termination of that litigation and not from any thought of death. It must be remembered that she recognized the contributions of her children to the costs and the conduct of the litigation. She premised her participation therein upon their contribution. While it is unnecessary to decide the question we would be remiss if we did not point out that there is some weight to the argument that consideration flowed from the children for the transfers made to them. Other points also might be urged to support our conclusion as well as a discussion *110 of the nunmerous authorities cited by the parties. We see no $ benefit, however, in laboring the question. Our decision on this record must be for the petitioners as we can not find that decedent's transfers were in contemplation of death. On the second issue, which was raised by respondent in his answer, we also hold for petitioners. If the transfers were proper and conveyed the cash to Burt A. Vrooman in 1939, then the fact that a portion of the $40,000 was on deposit in the joint names of himself and the decedent at the time of her death, will not suffice to include the property in her gross estate. The $10,000 became Burt's property in 1939. It was still his property in 1942. The mere fact that he had not elected to withdraw the money from deposit will not deprive him of his property rights. Decision will be entered for the petitioners.